UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LAURIE A. WILSON,

                    Plaintiff,

v.                                                    Case No.  5:09-cv-195-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                    Defendant.
_____/

## ORDER

        Plaintiff appeals from a final decision of the Commissioner of Social Security

("the Commissioner") denying his applications for a period of disability, disability

insurance benefits and Supplemental Security Income. (Doc. 1.) The Commissioner

has answered (Doc. 11), and both parties have filed briefs outlining their respective

positions. (Docs. 16 & 17.)  For the reasons discussed below, the Commissioner's

decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

        On December 12, 2002, Plaintiff filed applications for a period of disability,

disability insurance benefits and Supplemental Security Income alleging a disability

onset date of October 18, 2002. (R. 47-50, 277-79.)  Plaintiff's application was denied

initially and upon reconsideration. (R. 22-28, 34-35, 37-38, 268-76.)   Thereafter,

Plaintiff timely pursued her administrative remedies available before the Commissioner,

and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 33.)   ALJ R.

Neil Lewis conducted Plaintiff's administrative hearing on June 6, 2005. (R. 280-96.)

At the hearing, Plaintiff alleged she became disabled on January 18, 2002. (R. 284.) On October 25, 2005, ALJ Lewis issued a decision finding Plaintiff not disabled. (R. 10-21.)  The Appeals Council denied Plaintiff's request for review on February 21, 2007. (R. 4-6.)

Plaintiff sought review of the ALJ's October 2005 hearing decision in this Court – Wilson v. Astrue, No. 5:07-cv-165-Oc-10GRJ (M.D. Fla.).  Defendant requested that the Court remand the case for further administrative action.  On August 17, 2007, this Court remanded the case to the Commissioner pursuant to sentence four of 42 U.S.C. §405(g). (R. 332-40.)

After remand, Plaintiff appeared at a supplemental hearing before a different ALJ on February 27, 2008. (R. 430-65.)  Thereafter, the ALJ issued a decision on May 29, 2008, in which he found Plaintiff was not disabled. (R. 315-30.)  The Appeals Council denied review (R. 297-300) and Plaintiff filed the instant appeal.  (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

---

[1] 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

---

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12]  Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden

---

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant
(continued...)

by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back

---

[15](...continued)
numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18] Walker at 1003.

[19] Wolfe at 1077-78.

[20] Id.

to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was thirty-nine (39) years old at the time of the ALJ's hearing decision. (R. 433.)   Plaintiff has an eleventh grade education and has worked as a quality assurance inspector, laborer and supervisor at a plant nursery and cashier in a convenience store. (R. 69, 111, 435.)  Plaintiff alleges that she has been unable to work since January 18, 2002 due to pain with any movement of her arms, neck or back. (R. 57, 284.)

### *Back and Neck Pain*

From September 2002 through November 2002, Plaintiff had chiropractic treatment with Anthony Oliverio, D.C., for complaints of neck and back pain.  (R. 165-91.)  X-rays showed no fractures, dislocations or gross osseous aggressive processes of the cervical or lumbar spine.  As of November 2002, Dr. Oliverio opined that Plaintiff could return to work on a part-time basis – i.e., 3-4 hours a day. (R. 169.)

On November 21, 2002, Plaintiff was seen by Beena Stanley, M.D. with complaints of neck pain and numbness in both forearms. (R. 147-49.)  Dr. Stanley found tenderness in her neck and shoulders, and her hands felt cold, but her muscle strength was 5/5 in both the upper and lower extremities and flexion and lateral rotation of the neck was within normal limits. The remainder of the exam of the upper extremities was normal.  An MRI of Plaintiff's cervical spine revealed a congenital

---

[21] Doughty at 1278 n.2.

narrowing of the spinal canal and there was no evidence of herniated disc compression of the spinal corridor or existing nerve roots.  Dr. Stanley stated that she did not think it was appropriate to perform a nerve conduction study and advised Plaintiff to follow up with a neurosurgeon. (R. 146A.)

On January 14, 2003, Plaintiff saw Arif Sami, M.D. for further evaluation of constant pain in the lower neck and between her shoulder blades; intermittent hand and leg numbness; and chronic headaches. (R. 223-25.) Dr. Sami's findings were largely normal but he ordered nerve conduction studies which showed no evidence of carpal tunnel syndrome or ulnar neuropathy, nor was there evidence of denervation, acute or chronic, in the muscles of her left arm.  (R. 220-22.)    Plaintiff continued to report spasms in her back and left leg. (R. 216-19.)

At Plaintiff's request, Dr. Sami referred Plaintiff to Antonio DiScalfani, M.D. for a neurosurgical evaluation on May 28, 2003. (R. 216-17, 230.)  In a follow-up letter to Dr. Sami, Dr. DiScalfani wrote that Plaintiff's neck pain was "far and away her greatest pain" and she reported some occasional arm radiation.  (R. 230.)  However, she had no significant weakness in the upper or lower extremities.  On examination, Plaintiff had decreased range of motion of the neck but she had good strength from C5 through C8. She had a non-spastic gait and was non-hyperreflexic.  Dr. DiScalfani's impression was chronic mechanical neck pain. He concluded that Plaintiff was not a surgical candidate and that she would be best managed by a pain specialist.

More than two years later – in June 2005 – Plaintiff saw Charles M. Grudem, M.D. for a Social Security evaluation arranged by her attorney. (R. 257-62.)    The examination was cut short because Plaintiff's boyfriend, who was present, became

unconscious and was transported to the emergency room by ambulance.  It was noted that Plaintiff would return to complete the examination; however, there is no record that she did so.

Plaintiff reported to Dr. Grudem that due to pain she could not walk for more than one hour, lift heavy objects or sit for more than one hour.  On examination, Dr. Grudem found multiple positive trigger points, increased paraspinal tone from C2-C5-C6 and moderate to severe spasms in the levator scapulae bilaterally.  Sensory examination showed a C5 decrease and dysesthesia was noted; testing of C6-C8 produced tingling on the left.  Motor testing revealed definite muscle (or neuro muscular weakness) in left elbow flexion and extension.  Left wrist extension was weak and worsened rapidly with repeat testing. The lumbar spine and thoracic spine had increased tone on palpation. There were motor deficits in the left knee and great toe, and trace weakness of the left ankle extension and right knee extension.  Dr. Grudem completed a medical assessment of Plaintiff's ability to do work-related activities and found that Plaintiff could lift less than 5 pounds, stand and walk for 1-2 hours, sit less than one hour, and never climb, stoop or crawl. (R. 263-67.)

In April 2006, Plaintiff began treatment with the Citrus County Health Department. (R. 427-29.)  She was referred to Dr. Ruben for pain management but he refused to treat her as he believed she was a drug seeker.  (R. 421.)

Two non-examining state agency physicians completed RFC Assessments and concluded that Plaintiff retains the RFC to perform medium work involving frequent lifting of 25 pounds and occasional lifting of 50 pounds. (R. 195-202; 231-38.)

*Mental Impairments*

Plaintiff did not originally allege depression as a reason for seeking disability. (R. 57.)   Rather, in reports she submitted regarding her functioning, Plaintiff wrote that pain and medications were interfering with her concentration and social life.  (R. 89-98.)

Since as early as 1999, Plaintiff was treated for panic attacks at Harbor Family & Community Medicine, P.A. (R. 152-56.)  On March 31, 2003, Plaintiff was referred to Steven L. Weiss, Ph.D. by the Office of Disability Determinations for a consultative psychological evaluation. (R. 192-94.)  Plaintiff stated that she had been diagnosed with a panic disorder at age 18 and that she had been receiving medication from her primary care provider for her panic attacks.   She stated that since being on medication she has panic attacks once or twice a month.  She told Dr. Weiss that she also has been diagnosed with post-traumatic stress disorder due to sexual abuse when she was 8-years old; and it is accompanied by bouts of depression and uncontrollable crying triggered by life events.  Plaintiff reported that she lived with her brother and a friend; that she was able to eat, dress and maintain her own hygiene without assistance; and that her daily activities included dusting, cleaning, sweeping, laundry, dishes and light yard work, but she must do those things slowly due to her spinal stenosis.

On mental status examination, Plaintiff was able to name the months of the year in a forward direction without error and could name the months of the year in reverse with one reversal; she could solve simple arithmetic problems in her head; she was oriented to time, place and person; and she could perform four or five serial instructions. Her auditory memory for digits forward was within normal limits while her auditory memory for digits backward was unusually low.  Verbal recall was two of four words after

9

a ten minute interval and insight and judgment were within normal limits.  Plaintiff was able to pay bills by cash and could also use a checkbook.  Dr. Weiss's impression was Depressive Disorder NOS; Anxiety Disorder NOS; Panic Disorder without Agoraphobia; and History of Posttraumatic Stress Disorder (Self report).

On May 19, 2005, Plaintiff was seen by Ronald Poetter, Ph.D. for a general psychological evaluation. (R. 386-90.)  Plaintiff reported a history of childhood physical abuse but denied sexual victimization. She reported two suicidal gestures at the age of 16.  She reported that her first panic attack occurred when she was 18.  She reported having an estimated 3 to 4 panic attacks per week and said that these attacks required emergency room treatment about four times per year.  She also reported suffering from depression.   She said that she could not work due to chronic pain, difficulty gripping things, and trouble concentrating.  She reported worrying all the time and having limited stamina.

At the time of the evaluation, Plaintiff reported living with her boyfriend, bird and dog.  She stated that she has difficulty talking to strangers, and experiences social anxiety.  She has two friends, no outside activities, and no current interests or fun.  She reported that she does light housework, including laundry, cares for the animals, occasionally reads, goes grocery shopping, cooks and performs all of her activities of daily living independently.

Psychological testing showed that Plaintiff reads on an average level, but her arithmetic and writing skills were well below-average, though Dr. Poetter opined that Plaintiff appeared capable of independent management of her financial affairs.  WAIS-III test results suggested mild deficits in immediate memory, although questions on mental

status examination suggested severe deficits in auditory memory, both immediate and short-term.  She performed mental control exercises quickly and without error, which was inconsistent with severe concentration deficits.  She had average judgment and common sense reasoning skills.  Plaintiff reported that her usual mood was depressed and that it had become more so since her spinal condition was diagnosed three years earlier.  The WAIS-III revealed a verbal IQ of 81 in the low average range of intelligence.  Plaintiff's depressive symptoms scored in the upper moderate range and her anxiety scored in the very severe range.  Dr. Poetter noted that Plaintiff's personality test profile is suggestive of chronic severe underlying psychopathology, and raises the possiblity of an underlying thought disorder, although Dr. Poetter did not detect this in behavioral observations or mental status.  He further noted that it is clear that Plaitniff has suffered from severe emotional problems since childhood, secondary to exposure to phsycial abuse and suspected neglect.

Dr. Poetter's diagnosis was: Panic Disorder Without Agoraphobia; Major Depressive Disorder, Recurrent, Severe Without Psychotic Features; Pain Disorder Associated with Both Psychological Factors and a General Medical Condition; Exposure to Physical Abuse and Neglect as Child; Diagnosis deferred on Axis II; Chronic pain from reported spinal stenosis; and problems associated with unemployed status and access to mental health treatment.  He assessed a GAF of 45.

In June 2005, Dr. Poetter completed a medical source statement in which he opined that Plaintiff's mental impairments caused marked restrictions of activities of daily living; moderate difficulties in maintaining social functioning; frequent difficulties in

maintaining concentration, persistence or pace; and repeated episodes of decompensation, each of extended duration. (R. 252-56.)

Beginning in June 2006 through at least 2007, Plaintiff began treatment with the Citrus County Health Department for Bipolar I Disorder and Panic Disorder without Agoraphobia; progress notes show that she continued to have depression and anxiety. (R. 423-25.) In July 2006, Plaintiff reported "doing a little better," that she was "not as depressed as before," that her panic attacks were occurring less frequently, and that she was "almost feeling normal." (R. 419.)  In October 2007, Plaintiff reported that her mood had improved on an increased dose of Effexor.  (R. 408.) She denied depression but reported two "panic attacks" related to her boyfriend's behavior.  It was noted that she was forgetful but she had only mild impairments in concentration.

Two non-examining state agency psychologists completed Psychiatric Review Technique forms and opined that Plaintiff had no "severe" mental impairment. (R. 203-15; 239-51)

At the supplemental hearing, Plaintiff testified that she has continued to have severe pain in her lower back and neck. (R. 439.) Her neck pain is severe (way over 10 on a scale of 1 to 10) at least four or five hours per day. (R. 440.)  Her neck pain causes daily headaches, which force here to lay down. (R. 455-56.)  She testified that her lower back pain radiates bilaterally down her legs. (R. 441.)  Plaintiff testified that she can sit for about 10 to 15 minutes and then she has to change positions or in some cases go lay down and she can stand for six or seven hours.   (R. 442-43.)  She has trouble walking due to bone spurs in her feet; trouble bending due to her back and neck; a hard time gripping things; and she can lift up to four pounds. (R. 442-44.)  Plaintiff has

numbness and tingling in her left leg about four or five times per week. (R. 444.)
Plaintiff has not fallen recently. (R. 444-45.)

As for psychological impairments, Plaintiff testified that she is being treated for
panic attacks, depression and bipolar disorder.  (R. 446, 449.)  Plaintiff testified that she
has had panic attacks since she was eight but that medication controls them somewhat
and she has one only once every two to three months and they last about five minutes.
(R. 446-48.)  She has a crying spell once every three to six months, has trouble paying
attention and concentrating. (R. 447-48.)  Plaintiff testified that once or twice a week she
does not get out of bed due to her depression. (R. 449.)

At night, Plaintiff has trouble sleeping due to pain and usually sleeps for four or
five hours. (R. 452.)   Every few days, Plaintiff takes a nap. (R. 452.)  Plaintiff is currently
taking several medications – Effexor SX, Limbitrol, Xanax, Robaxin and Xanax.  (R.
445.)   She has gained fifty pounds over the past three years, which she attributes to her
medication. (R. 453.)   On a bad day, Plaintiff does not get out of bed. (R. 451.)  On a
good day, Plaintiff can sweep and mop and do the dishes for twenty or thirty minutes.
(R. 450-51.)  She gets up, takes a shower, gets dressed, does some housework –i.e.,
laundry, dishes.  Plaintiff testified that she does not socialize. (R. 456-57.)

In his review of the record, including Plaintiff's testimony and the medical records
from several health care providers, the ALJ determined that Plaintiff suffered from
congenital spinal stenosis of the cervical spine and an affective disorder.  (R. 320.)
However, the ALJ determined that Plaintiff did not have an impairment or combination of
impairments which met or medically equaled one of the impairments listed in Appendix
1, Subpart P of Social Security Regulation No. 4.   (R. 321-22.)

The ALJ then found that Plaintiff retained the RFC to perform light work except that she must avoid frequent ascending and descending of stairs, pushing and pulling with her lower extremities, and hazards in the workplace.  (R. 322-28.)  She can use her upper extremities for pushing and pulling; she cannot climb but she can occasionally perform other postural activities.  Due to psychologically based symptoms, she cannot focus on detailed tasks.  She is limited to simple, unskilled low-stress work.  She could not work in close proximity as a team member or with co-workers.  She should not work in direct contact with the public but could have some indirect contact with the public. The ALJ concluded that Plaintiff could not perform any past relevant work (R. 328) but that she can perform other jobs that exist in significant numbers in the national economy. (R. 329.)  In reaching this conclusion, the ALJ relied on the testimony of a VE.  Thus, the ALJ found that Plaintiff was not disabled.

## IV. <u>DISCUSSION</u>

Plaintiff only raises two issues on appeal. First, Plaintiff argues that the ALJ failed to properly evaluate her credibility. Secondly, Plaintiff contends that the hypothetical questions posed to the VE did not include all of Plaintiff's mental health limitations.  For the following reasons, the Court concludes that the ALJ's credibility analysis was adequate and supported by substantial record evidence and the hypothetical posed to the VE included all of Plaintiff's mental health limitations.

### A.   *The ALJ properly evaluated Plaintiff's credibility*

In evaluating disability, the ALJ must consider all of a claimant's impairments, including her subjective symptoms, such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical

14

evidence.[22]  The Eleventh Circuit has set forth a three-part test that applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms.[23]  The "pain standard", which applies to complaints of subjective conditions other than pain, requires that the plaintiff first produce medical or other evidence of an underlying medical condition.  Then the plaintiff must demonstrate either that objective medical evidence confirms the severity of the alleged symptom arising from that condition or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged symptom.[24]

If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[25]  While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[26] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[27]  However, a lack of a sufficiently explicit credibility finding becomes a

---

[22] 20 C.F.R. § 404.1528.

[23] Id. at 1560.

[24] Id.

[25] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[26] Foote at 1562-1563.

[27] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

ground for remand when credibility is critical to the outcome of the case.[28]  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision,  "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."[29] As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.[30]

In the instant case, it is clear that the ALJ applied the Eleventh Circuit's pain standard.  The ALJ outlined the two step pain standard and stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §404.1529 and 416.929 and SSRs 96-4p and 96-7p."  (R. 322.)  Moreover, the ALJ cited 20 C.F.R. §404.1529 which contains the same language regarding subjective testimony that the Eleventh Circuit interpreted when initially establishing the pain standard.[31]

In applying the pain standard, the ALJ found that Plaintiff met the initial burden of showing an underlying medical condition – congenital spinal stenosis of the cervical spine and an affective disorder –  that could be expected to give rise to pain and functional limitations.  Once Plaintiff met this initial burden, however, the ALJ found

---

[28] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

[29] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

[30] Id. at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[31] Wilson,  284 F.3d at 1226.

16

Plaintiff's complaints regarding her level of pain and the degree of functional limitations were not credible to the extent they were inconsistent with the residual functional capacity assessment that she could perform a range of light work.

Plaintiff argues that the ALJ had no evidentiary basis for rejecting her credibility. The Court disagrees and finds that substantial record evidence supports the ALJ's conclusion regarding Plaintiff's credibility.

Turning first to Plaintiff's allegations of disabling back and neck pain, the ALJ noted that clinical findings and imaging studies showed that her pain was mechanical and not related to a herniated disc, nerve root impingement or spinal cord compromise. (R. 323.)  A November 1, 2002 MRI of the lumbar spine showed the disc heights to be well-preserved without disc herniation and showed no specific abnormality. (R. 173.)  In addition, Dr. Stanley's November 21, 2002 findings support the ALJ's credibility finding. (R. 147-48.)  While Dr. Stanley noted tenderness in Plaintiff's neck and shoulders, Plaintiff's muscle strength was 5/5 in both the upper and lower extremities and flexion and lateral rotation of the neck was within normal limits.  Plaintiff's finger to nose and heel to shin tests were normal, as was her gait.  Another MRI of Plaintiff's cervical spine on November 25, 2002, showed congenital narrowing of the spinal canal without evidence of a herniated disc or compression of the spinal cord or exiting nerve roots. (R. 149.)

Moreover, Dr. Sami's findings fully support the ALJ's finding that Plaintiff was not fully credible.  On January 14, 2003, Dr. Sami evaluated Plaintiff for complaints of neck and back pain.  The examination, however, revealed only normal findings. (R. 223-25.) Plaintiff was able to ambulate with a normal base, walk on her tiptoes and heels and

tandem walk.  Finger to nose and rapid alternating movements were normal and she

had normal sensory examinations of the upper extremities, hands and lower extremities.

Examination of the back and neck showed no spasm in the paraspinal muscles.  Dr.

Sami ordered nerve conduction studies which showed no evidence of carpal tunnel

syndrome or ulnar neuropathy, nor was there evidence of denervation, acute or chronic,

in the muscles of her left arm.  (R. 220-22.)

In addition, Dr. DiScalfani's findings support the ALJ's credibility determination.

Dr. DiScalfani examined Plaintiff in May 2003 and wrote in a  follow-up letter to Dr. Sami,

that Plaintiff had no significant weakness in the upper or lower extremities; she had

decreased range of motion of the neck but she had good strength from C5 through C8;

and she had a non-spastic gait and was non-hyperreflexic.  Dr. DiScalfani's impression

was chronic mechanical neck pain. He concluded that Plaintiff was not a surgical

candidate and that she would be best managed by a pain specialist. The ALJ also noted

that Plaintiff was referred to pain management in 2006 but Dr. Ruben refused to treat

her because he believed she was a drug seeker.

Moreover, in evaluating Plaintiff's credibility, the ALJ properly discounted the

opinion of Dr. Grudem.  First, the ALJ correctly noted that Dr. Grudem did not treat

Plaintiff, but rather examined her on one occasion in June 2005.  Pursuant to the

regulations, medical opinions of non-treating sources do not enjoy a deferential status

and the weight the ALJ affords them will vary depending on many factors, including the

source's examining and treatment relationship with the claimant, and the opinion's

supportability and consistency with other evidence of records.[32]   Next, the ALJ noted that Dr. Grudem's findings were markedly different from those of the other physicians that Plaintiff had seen and the minimal spine impairment shown on the MRIs could not reasonably be expected to cause Plaintiff's alleged pain and limitations.   Indeed, for the two years preceding her evaluation with Dr. Grudem, Plaintiff received no medical treatment.  This lack of treatment is not consistent with Dr. Grudem's extreme conclusions that Plaintiff only could lift less than 5 pounds, stand and walk for 1-2 hours and sit less than one hour.

The ALJ also noted that Plaintiff's activities were not consistent were her allegedly disabling limitations.  Plaintiff testified or reported to doctors that she engaged in a variety of activities, including mopping, sweeping, cooking, washing dishes, performing light yard work, visiting friends, reading, grocery shopping, and caring for animals.  (R. 193, 323-24, 388, 450.)   It is well-settled that the ALJ may consider household and social activities in evaluating claims of disabling pain.[33]

As for mental impairments, the ALJ properly considered the consultative evaluations performed by Dr. Weiss and Dr. Poetter.  Dr. Weiss did not offer an opinion as to Plaintiff's functional limitations and his evaluation does not offer support for more severe limitations than those included in Plaintiff's RFC.  Accordingly, the ALJ discussion of his evaluation was proper.

---

[32] 20 C.F.R. §§404.1527(d), 416.927(d).

[33] Dyer v. Barnhart, 395 F.3d 1206, 1209-12 (11th Cir. 2005); Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. §404.1529(c)(3)(i); 20 C.F.R. §416.929(c)(3)(i).

The ALJ articulated several reasons, all of which are supported by substantial evidence, for according limited weight to Dr. Poetter's opinion that Plaintiff's mental impairments caused marked restrictions of activities of daily living; moderate difficulties in maintaining social functioning; frequent difficulties in maintaining concentration, persistence or pace; and repeated episodes of decompensation, each of extended duration. (R. 252-56.)  As an initial matter, because Dr. Poetter was not a treating source, his opinion does not enjoy a deferential status and the weight the ALJ affords them will vary depending on many factors, including the source's examining and treatment relationship with the claimant, and the opinion's supportability and consistency with other evidence of records.[34]

These reasons include the Plaintiff's inconsistent reports about the frequency of panic attacks, which undermined her credibility.  Plaintiff told Dr. Poetter that she was having three to four panic attacks per week (R. 387, 390), but she told Dr. Weiss that her panic attacks were occurring once or twice per month with medication .(R. 192.)   At the hearing Plaintiff only reported panic attacks once every two to three months.  (R. 446-47.)  In addition, Plaintiff told Dr. Poetter that she had been physically abused as a child, but denied sexual abuse; yet she told Dr. Weiss that she had been sexually abused at 8 years old, which led to a diagnosis of post-traumatic stress syndrome. (R. 192, 194, 386.)

Second, the ALJ correctly noted that Dr. Poetter's opinions regarding Plaintiff's marked limitation in activities of daily living and concentration, persistence and pace

---

[34] 20 C.F.R. §§404.1527(d), 416.927(d).

were inconsistent with Plaintiff's report of how she spends her days and other record evidence.  According to Dr. Poetter's own report, Plaintiff is able to attend to her own personal needs, do household chores, go grocery shopping and visit regularly with two friends.  She is capable of managing her own finances despite her deficits in arithmetic. Moreover, while mental status examination suggested immediate auditory memory deficits, formal testing showed only mild immediate memory deficits and other testing was inconsistent with concentration deficits.  Lastly, the evidence failed to demonstrate that Plaintiff has ever had any episodes of decompensation of extended duration. Plaintiff denied any psychiatric hospitalizations and recent mental health treatment notes show improvement in her symptoms. (R. 408-29.)  Indeed, notes from October 2007 show that her mood had improved, that she was not depressed and that she had two "panic attacks" related to her boyfriend's behavior.  (R. 408.)  Plaintiff was noted to be forgetful but she had only mild impairments in concentration.

Accordingly,  the Court concludes that the ALJ explicitly articulated legitimate reasons to discredit Plaintiff's subjective complaints and those reasons are supported by substantial record evidence.

### B.      The Vocational Expert's testimony provides substantial evidence to support the ALJ's finding that Plaintiff could perform other work

Plaintiff's second argument on appeal is that the ALJ erred in relying upon VE testimony based upon a defective hypothetical question. The ALJ is required to describe Plaintiff's educational level, age, work skills, experience, and all of Plaintiff's impairments when presenting a hypothetical question to a VE.[35]

---

[35] Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).

Based on his careful consideration of the entire record, the ALJ determined that, prior to July 1, 2007, Plaintiff had the RFC to perform a limited range of light work. (R. 322.) With respect to psychologically based symptoms, the ALJ found that Plaintiff cannot focus on detailed tasks; she is limited to simple, unskilled low-stress work; she could not work in close proximity as a team member or with co-workers; and she should not work in direct contact with the public but could have some indirect contact with the public.  At the hearing, the ALJ asked the VE a hypothetical that incorporated all of these psychological limitations. (R. 460-62.)  In response to the hypothetical, the VE identified three representative occupations that an individual with such limitations would be capable of performing: a marker or labeler,[36] a remnant sorter,[37] and a nut and bolt assembler.[38] (R. 462-63.)

Plaintiff argues that the hypothetical was incomplete because it failed to include all of the limitations arising out of Plaintiff's mental health impairments, including those identified by Dr. Poetter.[39] However, as previously discussed, the ALJ properly considered the functional limitations resulting from Plaintiff's mental impairments during his assessment of Plaintiff's RFC. Plaintiff fails to identify what limitations (attributable to Plaintiff's mental impairments) should have, but were not, included in the hypothetical. Further, to the extent Plaintiff argues that the ALJ should have included the actual

---

[36] DICTIONARY OF OCCUPATIONAL TITLES § 920.687-126 (4th ed. 1991).

[37] Id. § 789.687-146.

[38] Id. § 929.587-010.

[39] Plaintiff also argues that the Commissioner failed to include in the record the two Mental Residual Functional Capacity Assessment forms that were completed by the state agency physicians who completed the Psychiatric Review Technique Forms that are included in the file.  However, based on the state agency physicians' conclusions that Plaintiff did not have a severe mental impairment (R. 203-15, 239-51), there was no need to determine what mental limitations Plaintiff had.  Indeed, if a mental impairment is not severe, it does not cause significant limitations on a claimant's functional capacity.

diagnosis in the hypothetical – such an argument lacks merit. A hypothetical question is not deficient merely because it fails to include diagnostic terms or refer to specific medical conditions.[40] It is the ALJ, and not the VE, who is charged with the responsibility of evaluating the medical evidence to form an assessment of a claimant's RFC.[41] The VE's role is limited to assessing the availability of employment opportunities for a person with the RFC and vocational profile set forth in the hypotheticals posed by the ALJ.

In sum, the hypothetical presented to the VE fully incorporated all of the mental limitations associated with Plaintiff's RFC. Accordingly, because the ALJ appropriately assessed Plaintiff's RFC, the ALJ's reliance upon the VE's testimony was supported by substantial evidence.

## V. **CONCLUSION**

In view of the foregoing, the decision of the Commissioner is **AFFIRMED** under sentence four of 42 U.S.C. § 405(g). The Clerk is directed to enter final judgment consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 22, 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:
  All Counsel

---

[40] *See* Webb v. Comm'r of Soc. Sec., 368 F.3d 629 (6th Cir. 2004).

[41] 20 C.F.R. § 404.1546(c).